**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:
Clifford W. Taylor

Justices:
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman

**FILED JULY 21, 2005**

PEOPLE OF THE STATE OF MICHIGAN,

    Plaintiff-Appellee,

v                              No. 124996

JEROME L. KNIGHT,

    Defendant-Appellant.

_____

PEOPLE OF THE STATE OF MICHIGAN,

    Plaintiff-Appellee,

v                              No. 125101

GREGORY M. RICE,

    Defendant-Appellant.

_____

**BEFORE THE ENTIRE BENCH**

**CORRIGAN, J.**

In these consolidated appeals, we are called upon to clarify our *Batson v Kentucky*, 476 US 79; 106 S Ct 1712; 90 L Ed 2d 69 (1986), jurisprudence and provide guidance to our lower courts. Specifically, this Court must decide whether the trial court in these cases determined that *Batson* had been violated; namely, we must discern whether

the trial court concluded that the prosecutor exercised peremptory challenges to exclude certain prospective jurors from the jury pool on the basis of race. On the basis of our reading of the voir dire transcripts, we hold that no *Batson* violation existed in this case and the trial judge neither explicitly nor implicitly found that the prosecutor purposefully discriminated in the exercise of three peremptory challenges. Having reviewed the whole record and the fair inferences to be drawn from it, we cannot conclude that the trial judge implicitly found that the prosecutor purposefully discriminated. Instead, the trial judge's ambiguous statements were driven by her goal of ensuring a racially mixed jury, not concern with determining whether the prosecutor's asserted reasons for exercising peremptory challenges were a pretext. Indeed, the trial judge's only clear statement reflected her finding that neither the prosecutor nor defense counsel had engaged in racially discriminatory behavior. Accordingly, we affirm defendants' convictions.

## I. Factual Background

Defendant Knight and codefendant Rice were charged with first-degree murder, MCL 750.316, stemming from the shooting death of defendant Knight's former girlfriend. Codefendant Rice was also charged with one count of

2

possession of a firearm during the commission of a felony, MCL 750.227b. The prosecutor's theory was that defendant Knight had unsuccessfully tried to hire someone to kill his former girlfriend. After his initial efforts failed, according to the prosecutor, defendant Knight bailed codefendant Rice out of jail in exchange for codefendant Rice's killing the former girlfriend. Defendant Knight and codefendant Rice were tried jointly before the same jury.

During the third day of jury selection, defense counsel initially objected to the prosecutor's use of peremptory challenges, claiming that the prosecutor was attempting to exclude African-American veniremembers. Defense counsel expressed particular dissatisfaction with the prosecutor's reason for dismissing veniremember nine, which was that a member of veniremember nine's family had been convicted of rape. Defense counsel then demonstrated his misunderstanding of *Batson* by responding, "I don't believe that whether or not there is assaultive [sic] and battery involved in that particular person's family is a basis on which to exclude someone when you already have a pattern. I have noticed this pattern since day one of the jury trial. That's why seventy-five percent of the exclusions have been black."

3

The prosecutor immediately interjected that she had excluded three African-American veniremembers and four Caucasian veniremembers and offered race-neutral reasons for excluding the African-American veniremembers. The trial judge stated, "There have been four whites excluded, exempted by the prosecution and three blacks. So just based on that I don't see a *Batson* problem." Defense counsel then commented on the racial composition of the jury pool, stating, "If you have seventy-five percent white prospective jurors, Your Honor, and twenty-five percent black prospective jurors, now the schedule has turned and that's exactly what we've had in three days of jury selection." Defense counsel appeared to argue here not for the racially neutral exercise of peremptory challenges, but for the exercise of challenges in proportion to the overall racial division of the array. The trial judge then found no *Batson* violation, stating:

> But that's not the prosecution or the defense's fault that we are getting largely white jurors. If that's an issue, that's another issue, and that can be dealt with another way.
>
> *But in this particular case and this particular matter, I do not see a pattern of the prosecution improperly excluding African American males, because they've only excluded one, or African American females where two have been excluded.*
>
> *I think the reasons are acceptable. So I don't see a problem there.*

4

There's still right now, I don't know if this is going to end up being our jurors, but there are quite a few—I don't know who's left up there. *But the fact that the composition of the jury panel is largely white, it's like I said, another issue. And that can be dealt with in another way.*

*I deny the motion* that the prosecution has improperly excluding [sic] minorities from the jury panel. [Emphasis added.]

The court then recessed for lunch. After lunch, the prosecutor dismissed three African-American women, veniremembers Bonner, Johnson, and Jones. Defense counsel did not contemporaneously object to the exercise of peremptory challenges against veniremembers Bonner and Johnson. Defense counsel objected only to the dismissal of veniremember Jones, contending that the prosecutor was attempting to exclude black females in violation of *Batson*.[1] He pointed out that the prosecutor had exercised three consecutive challenges against African-American women. Without waiting for the trial judge's ruling regarding whether a prima facie showing of purposeful discrimination had been made, the prosecutor immediately provided race-neutral reasons for the three exclusions, although defense

---

[1] Veniremember Jones, believing that she was dismissed, left the courthouse before the trial judge ruled on defense counsel's *Batson* objection.

counsel had not objected to the challenges regarding veniremembers Bonner and Johnson. The prosecutor stated that she dismissed veniremember Bonner because Bonner was a close relative of two persons convicted of first-degree murder. She dismissed veniremember Johnson because of Johnson's body language, the tone of her voice, and the hesitant look she gave when she stated that she could be fair. Finally, she dismissed veniremember Jones because Jones was a professional woman who had a daughter close in age to the victim. The prosecutor noted that Jones's daughter was not "similarly situated" to the victim and that Jones might compare and contrast the lifestyles of the victim and her daughter.

The trial judge responded by stating, "Just before we recessed for lunch, I thought that it was very clear that we didn't have a problem here. But now I think we are getting very close to a sensitive issue." The trial judge rejected the prosecutor's reasons for dismissing veniremember Johnson, but stated that she had not objected to Johnson's dismissal because defense counsel had not objected. The trial judge did not accept the prosecutor's reasons for dismissing veniremember Jones:

> The same thing with Miss Jones. I do not see a reason other than—I mean, it seems to me for the prosecution to say, she has a daughter the same age as the victim, that would seem to

work in the prosecution's favor, just in terms of thinking in the jury selection. So I don't accept that.

*   *   *

*I do see that we are getting close, and there are, I don't know[,] two or three minority jurors left on this panel. So I think we are getting close to a serious issue here.*

I wish that somebody had said something about keeping Miss Jones and Miss Johnson. And then we address this matter because I probably would not have excused either one of them. [Emphasis added.]

Defense counsel interrupted the trial judge at that point to clarify that Jones was the last veniremember struck and that he objected to the exclusion of Jones. Despite defense counsel's comment, the trial judge stated, "[I]f an objection had been made as far as Miss Johnson and Miss Jones[,] I probably would have addressed it. And I tend to think I probably would have kept them on the jury."[2]

The prosecutor then stated that dismissal was appropriate as long as she advanced race-neutral reasons for the dismissal. The trial judge replied that she had to either accept or reject the prosecutor's "neutral" reasons. She further stated, "And I'm not, I'm saying that *I think*

_____

[2] It is not clear from the record whether the trial judge mistakenly referred to veniremember Bonner as veniremember Jones, or truly believed that an objection had not been made regarding veniremember Jones's dismissal.

7

*we're getting close to a sensitive issue here on Jones and Johnson. That's all I'm saying. I'm making my record too."*

The trial judge twice referred to getting close to a "sensitive issue." We do not think this language reflects that the sensitive issue was purposeful discrimination. Instead, we believe the sensitive issue was the looming absence of minorities in the array and on the petit jury.

The prosecutor acknowledged the trial judge's comments. She immediately raised a reverse-*Batson* challenge to defense counsel's exercise of peremptory challenges to exclude five female Caucasian veniremembers and one male Caucasian veniremember. Defense counsel again demonstrated his misunderstanding of *Batson* by stating:

> I would indicate to the Court, Your Honor, that sister counsel fails to recognize that there are at least four white women that are on the jury.
>
> * * *
>
> I don't believe with regards to the fact that they happen to be white women, I think the Court also has to recognize that the greatest number of people that have come through that jury, as potential jurors, have been in fact white people.[3]

---

[3] Justice Cavanagh claims that defense counsel's objections did not demonstrate his misunderstanding of *Batson*. Rather, he states that defense counsel's comments amount to an attempt to establish a prima facie case of purposeful discrimination by asserting that the prosecutor

(continued…)

Defense counsel then requested that the trial judge first make a ruling regarding his *Batson* objection. The following colloquy ensued:

> *[Defense Counsel]*: But, I don't think the Court ruled on whether or not you're going to allow Miss Jones to be struck. She's still downstairs, I'm sure.
>
> *[The Trial Judge]*: I don't know if she is or not.
>
> *[The Prosecutor]*: I thought she was held.
>
> *[The Trial Judge]*: If she is still here, I'm going to keep her.
>
> *[Defense counsel]*: Thank you.
>
> *[The Deputy]*: Miss Jones, she has already gone.

The trial judge then allowed defense counsel to make a record regarding the prosecutor's reverse-*Batson* challenge, but never ruled on the challenge. Defense counsel responded by stating, "I believe the answer lies in the panel that's left. There is no pattern . . . ." After further discussion, the trial judge concluded that any

---

(…continued)

had engaged in a pattern of systematically excluding African-American veniremembers. We disagree. The record, when read as a whole, clearly demonstrates that defense counsel's *Batson* objections were made to prevent the prosecutor from excluding any African-American veniremembers, even if the prosecutor provided race-neutral reasons for doing so, because the majority of the veniremembers, by chance, was Caucasian.

*Batson* problems that may have occurred were cured because African-American women were fairly represented on the jury panel. She stated:

> I'm not satisfied with the prosecutor's response as to potential juror Jones and Johnson. But I think they've already left.
>
> So I'm going to say from this point on let's be very careful about the selection. If you think that you, if the defense is not satisfied with me just giving a cautionary instruction to the prosecution, then I'll address any other remedy.
>
> But, realistically *I think all of us are being, trying to be conscientious about the selection of these jurors because of the racial makeup of the jury panels, which we don't have any control over.*
>
> I'm just saying, I let Jones and Johnson go without holding them, especially Jones. I guess I should have held her and I didn't do that. I'll take the fault for that. But from this point on let's try to be careful with this jury selection. We are to [sic] close to getting this jury selected. [Emphasis added.]

After sending the deputy to search for veniremember Jones again with no success, the trial judge stated, "I don't think it is serious enough at this point. *We do have some minorities left on the jury panel* and I'll be watching this closely." Finally, at the end of jury selection, the trial judge commented:

> *With the panel we ended up with, I think that any Batson problems that may have been there have been cured.*

10

> *We have the same number if not more jurors, African American female jurors on the panel as if we had kept [veniremember] Johnson and [veniremember] Jones.*
>
> *I don't think either side ended up selecting this panel for any other reason other than I think that these are the ones who will be the fair and impartial persons to hear and try this case.* [Emphasis added.]

In the end, the jury convicted defendant Knight of first-degree murder and codefendant Rice of first-degree murder and felony-firearm.

Both defendants appealed as of right, and the Court of Appeals affirmed.[4]  In defendant Knight's case, the Court of Appeals found that the prosecutor presented adequate race-neutral reasons for excusing the prospective jurors and, thus, the trial court did not abuse its discretion in rejecting defendant's *Batson* challenge.  While codefendant Rice's counsel joined in the *Batson* challenge at trial, codefendant Rice did not raise the *Batson* issue in the Court of Appeals.  Both defendants sought leave to appeal in this Court.

---

[4] *People v Knight*, unpublished opinion per curiam of the Court of Appeals, issued October 15, 2002 (Docket No. 231845); *People v Rice*, unpublished opinion per curiam of the Court of Appeals, issued October 15, 2002 (Docket No. 225865).  Both defendants assigned numerous claims of error, but only the *Batson* issue is relevant for purposes of these appeals.

11

In lieu of granting leave to appeal, we vacated the judgments of the Court of Appeals and remanded for reconsideration in light of *Batson, supra,* and *Miller-El v Cockrell,* 537 US 322, 340; 123 S Ct 1029; 154 L Ed 2d 931 (2003) (*Miller-El I*).[5]  On remand, the Court of Appeals again affirmed the convictions, finding no evidence of purposeful discrimination.[6]  We granted leave to appeal and further ordered these cases to be argued and submitted together.[7]

## II. Legal Background

### A. The *Batson* Procedure

Under the Equal Protection Clause of the Fourteenth Amendment,[8] a party may not exercise a peremptory challenge to remove a prospective juror solely on the basis of the person's race.  *Swain v Alabama,* 380 US 202, 203-204; 85 S Ct 824; 13 L Ed 2d 759 (1965); see also *Georgia v McCollum,*

---

[5] *People v Knight,* 468 Mich 922 (2003); *People v Rice,* 468 Mich 922 (2003).

[6] *People v Knight (On Remand),* unpublished opinion per curiam of the Court of Appeals, issued October 7, 2003 (Docket No. 231845); *People v Rice (On Remand),* unpublished opinion per curiam of the Court of Appeals, issued October 7, 2003 (Docket No. 225865).

[7] 470 Mich 869 (2004).

[8] US Const, Am XIV, § 1 provides in relevant part: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."

12

505 US 42; 112 S Ct 2348; 120 L Ed 2d 33 (1992); *Edmonson v Leesville Concrete Co, Inc,* 500 US 614; 111 S Ct 2077; 114 L Ed 2d 660 (1991).  In *Batson*, *supra* at 96-98, the United States Supreme Court announced a three-step process for determining the constitutional propriety of a peremptory challenge.

First, the opponent of the peremptory challenge must make a prima facie showing of discrimination.  *Id*. at 96. To establish a prima facie case of discrimination based on race, the opponent must show that: (1) he is a member of a cognizable racial group; (2) the proponent has exercised a peremptory challenge to exclude a member of a certain racial group from the jury pool; and (3) all the relevant circumstances raise an inference that the proponent of the challenge excluded the prospective juror on the basis of race.  *Id*.[9]  The United States Supreme Court has made it

_____

[9] In *Swain*, *supra* at 223-224, the United States Supreme Court required the defendant to show that the prosecution had a practice or pattern of using peremptory challenges in "case after case."  In *Batson*, *supra* at 92-93, however, the Court sought to alleviate *Swain*'s "crippling burden of proof" and eliminated the requirement that the defendant make a prima facie showing by reference to other cases. Further, it must be observed that the striking of even a single juror on the basis of race violates the Constitution.  See, e.g., *J E B v Alabama ex rel T B*, 511 US 127, 142 n 13; 114 S Ct 1419; 128 L Ed 2d 89 (1994) ("The exclusion of even one juror for impermissible reasons harms that juror and undermines public confidence in the
(continued…)

13

clear that the opponent of the challenge is not required at *Batson's* first step to actually prove discrimination. *Johnson v California*, __ US __; 125 S Ct 2410; 162 L Ed 2d 129 (2005).[10]  Indeed, "so long as the sum of the proffered facts gives 'rise to an *inference* of discriminatory purpose,'" *Batson's* first step is satisfied.  *Id.* at ___ US

_____

(…continued)
fairness of the system.").   See also *United States v Clemons*, 843 F2d 741, 747 (CA 3, 1988), *cert den* 488 US 835 (1988); *United States v Lane*, 866 F2d 103, 105 (CA 4, 1989); *United States v Battle*, 836 F2d 1084, 1086 (CA 8, 1987); *United States v Vasquez-Lopez*, 22 F3d 900, 902 (CA 9, 1994); *United States v David*, 803 F2d 1567, 1571 (CA 11, 1986).

[10]  In *Johnson*, the United States Supreme Court addressed California's approach to examining *Batson's* first step.  While the Court recognized that the states have some degree of flexibility in formulating appropriate procedures to comply with *Batson*, the Court concluded that California's approach was inappropriate.  *Id.*, ___ US ___; 125 S Ct 2416; 162 L Ed 2d 138.  The California Supreme Court had concluded that at *Batson's* first step, the opponent of the challenge must present strong evidence that makes discriminatory intent more likely than not.  The United States Supreme Court rejected this approach, observing:

> We did not intend [*Batson's*] first step to be so onerous that a defendant would have to persuade the judge--on the basis of all the facts, some of which are impossible for the defendant to know with certainty--that the challenge was more likely than not the product of purposeful discrimination.  Instead, a defendant satisfies the requirements of *Batson's* first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred.  [*Id.*, ___ US ___; 125 S Ct 2417; 162 L Ed 2d 139.]

14

___; 125 S Ct 2416; 162 L Ed 2d 138 (internal citation omitted; emphasis added).

Second, if the trial court determines that a prima facie showing has been made, the burden shifts to the proponent of the peremptory challenge to articulate a race-neutral explanation for the strike. *Batson, supra* at 97. *Batson's* second step "does not demand an explanation that is persuasive, or even plausible." *Purkett v Elem*, 514 US 765, 768; 115 S Ct 1769; 131 L Ed 2d 834 (1995). Rather, the issue is whether the proponent's explanation is facially valid as a matter of law. *Id*.; *Hernandez v New York*, 500 US 352, 360; 111 S Ct 1859; 114 L Ed 2d 395 (1991) (plurality opinion). "A neutral explanation in the context of our analysis here means an explanation based on something other than the race of the juror. . . . Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Id.*

Finally, if the proponent provides a race-neutral explanation as a matter of law, the trial court must then determine whether the race-neutral explanation is a pretext and whether the opponent of the challenge has proved purposeful discrimination. *Batson, supra* at 98. It must be noted, however, that if the proponent of the challenge

15

offers a race-neutral explanation and the trial court rules on the ultimate question of purposeful discrimination, the first *Batson* step (whether the opponent of the challenge made a prima facie showing) becomes moot. *Hernandez*, *supra* at 359.

## B. Reviewing *Batson* Claims

Generally, we review a trial court's factual findings for clear error. MCR 2.613(C). Further, we review questions of law de novo. *People v Nickens*, 470 Mich 622, 626; 685 NW2d 657 (2004). As a practical matter, however, appellate courts sometimes struggle with determining whether a particular issue presents a question of law or fact. In some instances, the line can become quite blurred. *Batson* error claims frequently appear to fall into the blurred category, and courts have labored to formulate a generally accepted standard of review for *Batson* cases that applies to all levels of the *Batson* inquiry. The cases at hand give us the opportunity to clarify our own standard for reviewing *Batson* errors. We conclude that the applicable standard of review depends on which *Batson* step is at issue before the appellate court.

### 1. Determining What the Trial Court Has Ruled

Before a reviewing court can determine which standard of review applies for purposes of *Batson's* three steps, the

court must first ascertain what the trial court actually ruled. When a trial court methodically adheres to *Batson's* three-step test and clearly articulates its findings on the record, issues concerning what the trial court has ruled are significantly ameliorated. See, e.g., *United States v Castorena-Jaime*, 285 F3d 916, 929 (CA 10, 2002). Not only does faithful adherence to the *Batson* procedures greatly assist appellate court review, but the parties, the trial court, and the jurors are well-served by thoughtful consideration of each of *Batson's* steps as well. Thus, we observe that *Batson*, as a constitutional decision, is not discretionary. Our trial courts must meticulously follow *Batson's* three-step test, and we *strongly* urge our courts to *clearly* articulate their findings and conclusions on the record.

In the event a trial court fails to clearly state its findings and conclusion on the record, an appellate court must determine on the basis of a fair reading of the record what the trial court has found and ruled. See, e.g., *Mahaffey v Page*, 162 F3d 481, 482-483 (CA 7, 1998). This is not the preferred route. Because of the importance of the right at stake, as well as the societal and judicial interests implicated, we again direct our trial courts to carefully follow each of *Batson's* three steps, and we

17

further urge the courts to clearly articulate their findings and conclusions with respect to each step on the record. Once it is determined what the trial court has found and ruled, the reviewing court must decide what *Batson* step is at issue in the particular case and how the claim of error should be reviewed.

2. Standard of Review for *Batson*'s First Step

While there is somewhat of a consensus on the standards of review applicable to *Batson*'s second step, and the scope of review for the third step is well-settled, courts appear to be split with regard to the proper standard of review when examining *Batson*'s first step. For example, the Ninth Circuit Court of Appeals en banc concluded that a trial court's determination whether the opponent of the peremptory challenge made out a prima facie case of discrimination should be reviewed for clear error. *Tolbert v Page*, 182 F3d 677 (CA 9, 1999). In *Tolbert*, the Ninth Circuit concluded that *Batson*'s first step presented a mixed question of law and fact; however, the *Tolbert* court reasoned:

> At the *Batson* prima facie showing step, the concerns of judicial administration tip in favor of the trial court and, therefore, a deferential standard of review prevails. Our conclusion is based on the language of *Batson* itself, which describes the prima facie analysis as a "factual inquiry," *Batson*, 476 U.S. at 95, and makes clear that the trial court is to be the primary

18

adjudicator of that analysis: "We have confidence that *trial judges*, experienced in supervising voir dire, *will be able to decide if the circumstances* concerning the prosecutor's use of peremptory challenges *create[] a prima facie case* of discrimination." *Id*. at 97 (emphasis added).

Our holding is also consistent with more recent teachings of the Supreme Court, which counsel in favor of applying a deferential standard of review to certain mixed questions. *See Salve Regina College v. Russell*, 499 U.S. 225, 233, 111 S. Ct. 1217, 113 L Ed 2d 190 (1991). Deferential review is appropriate either "when it appears that the district court is 'better positioned' than the appellate court to decide the issue in question," or when "probing appellate scrutiny will not contribute to the clarity of legal doctrine." *Id.* [*Tolbert*, *supra* at 682.]

When faced with the same question, however, the Seventh Circuit Court of Appeals concluded that a de novo standard applies to a trial court's determination whether a prima facie showing of discrimination has been made. *Mahaffey, supra* at 484. The Seventh Circuit likewise observed that whether the facts alleged by the opponent of the peremptory challenge satisfied the opponent's burden under *Batson*'s first step is a mixed question of law and fact. *Id.* Nonetheless, the Seventh Circuit opined that "[t]he question of whether an inference of discrimination may be drawn from a set of undisputed facts relating to the racial makeup of the jury venire and the prosecutor's exercise of peremptory challenges is . . . one over which the appellate courts should exercise a degree of control

that a clear error standard would not afford." *Id*.
Moreover, in light of the importance of the constitutional
right implicated, the Seventh Circuit reasoned that the de
novo standard "would allow for a measure of consistency in
the treatment of similar factual settings, rather than
permitting different trial judges to reach inconsistent
conclusions about the prima facie case on the same or
similar facts." *Id*. Thus, the *Mahaffey* Court concluded
that the de novo standard of review applies to the prima
facie showing of discrimination prong.

Similar to the Seventh Circuit, the Supreme Court of
Colorado has also concluded that *Batson*'s first step is
subject to review de novo. *Valdez v People*, 966 P2d 587,
591 (Colo, 1998). The *Valdez* court noted that the First,
Eighth, and Ninth circuits adhere to a clear error standard
when reviewing the prima facie determination under the
*Batson* framework. However, the Colorado Supreme Court also
observed that the Tenth Circuit Court of Appeals, as well
as appellate courts in Kansas, Tennessee, and Utah, have
concluded that *Batson*'s first step is subject to review de
novo. Weighing the aforementioned cases and turning to
Title VII case law for additional guidance, the *Valdez*
court concluded:

> Therefore, although we afford deference to
> the trial court's ultimate determination of a

20

*Batson* challenge in step three, we believe that the first step involves a question of legal sufficiency over which the appellate court must have plenary review. We continue to defer to the underlying factual findings, including any predicate credibility determinations of the trial court upon which its prima facie determination under *Batson* is based. However, we hold that the question of whether the defendant has established a prima facie case under *Batson* is a matter of law, and we apply a de novo standard of review to a trial court's prima facie determination of the Batson analysis. [*Valdez, supra* at 591.]

We agree with those jurisdictions that have concluded that *Batson*'s first step is appropriately categorized as a mixed question of law and fact. We, however, chose to follow Michigan's well-established procedure of reviewing questions of law de novo and factual findings for clear error. *People v McRae*, 469 Mich 704, 710; 678 NW2d 425 (2004). We thus conclude that the first *Batson* step is a mixed question of fact and law that is subject to both a clear error (factual) and a de novo (legal) standard of review. A trial judge must first find the facts and then must decide whether those facts constitute a prima facie case of discrimination under *Batson* and its progeny.

We acknowledge that the United States Supreme Court has emphasized that the focus of *Batson* is not merely on the individual criminal defendant. See, e.g., *Powers v Ohio*, 499 US 400, 405-410; 111 S Ct 1364; 113 L Ed 2d 411 (1991). Rather, the focus is also on the integrity of the

21

judicial system, as well as the rights of the prospective jurors.  *Id.* at 410-414.[11]  Unquestionably, ensuring the integrity of the judicial process and maintaining fair jury selection procedures are paramount concerns.  However, these concerns do not persuade us that *Batson's* first step should be treated any differently than other mixed questions of law and fact.  Indeed, we believe that these paramount concerns can be effectuated under our established rules for appellate review.  Thus, until the United States Supreme Court holds otherwise, under *Batson's* first step, we will review the questions of law de novo and the factual findings for clear error.

### 3. Standard of Review for *Batson's* Second Step

While there appears to be some disagreement about the standard of review for *Batson's* second step, we believe that those jurisdictions that have concluded that the second step is subject to review de novo have the better view.  See, e.g., *United States v Bishop*, 959 F2d 820, 821 n 1 (CA 9, 1992); *Hurd v Pittsburg State Univ*, 109 F3d 1540, 1546 (CA 10, 1997); *Valdez, supra* at 590.  We believe

---

[11] See also Herman, *Why the court loves Batson: Representation-Reinforcement, colorblindness, and the jury*, 67 Tul L R 1807, 1814-1815 (1993) ("A criminal defendant is permitted to raise Batson challenges not on the theory that his or her own rights have been violated, but rather on the theory that he or she is being afforded standing to raise the rights of a third party—the prospective juror.").

that such an approach is consistent with controlling United States Supreme Court precedent. See, e.g., *Hernandez*, *supra* at 359("In evaluating the race neutrality of an attorney's explanation, a court must determine whether, assuming the proffered reasons for the peremptory challenges are true, the challenges violate the Equal Protection Clause as *a matter of law*.")(emphasis added).

It is important to bear in mind that it is not until *Batson*'s third step that the persuasiveness of the proffered explanation for the peremptory challenge becomes relevant. *Purkett*, *supra* at 768.[12] Accordingly, at *Batson*'s second step, a court is only concerned with whether the proffered reason violates the Equal Protection Clause as a matter of law. See, e.g., *United States v Uwaezhoke*, 995 F2d 388, 392 (CA 3, 1993) ("Thus, if the government's explanation does not, on its face, discriminate on the basis of race, then we must find that the explanation passes *Batson* muster as a matter of law,

_____

[12] See also *Johnson*, *supra*, ___ US ___; 125 S Ct 2417-2418; 162 L Ed 2d 140, quoting *Purkett*, *supra* at 768 ("The first two *Batson* steps govern the production of evidence that allows the trial court to determine the persuasiveness of the defendant's constitutional claim. 'It is not until the *third* step that the persuasiveness of the justification becomes relevant--the step in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination.'").

23

and we pass to the third step of *Batson* analysis to determine whether the race-neutral and facially valid reason was, as a matter of fact, a mere pretext for actual discriminatory intent."). It is also important to bear in mind that only in rare cases is the proffered explanation facially invalid because such direct evidence is equally rare. We thus conclude that the de novo standard governs appellate review of *Batson*'s second step.

4. Standard of Review for *Batson*'s Third Step

It is well-settled that a trial court's determination concerning whether the opponent of the peremptory challenge has satisfied the ultimate burden of proving purposeful discrimination is a question of fact that is reviewed for clear error. *Hernandez*, *supra* at 364-365; *United States v Hill*, 146 F3d 337, 341 (CA 6, 1998). Moreover, the trial court's ultimate factual finding is accorded great deference. *Miller-El I, supra* at 340. The United States Supreme Court has observed that "[d]eference to trial court findings on the issue of discriminatory intent makes particular sense in this context because . . . the finding 'largely will turn on evaluation of credibility.'" *Hernandez*, *supra* at 365, quoting *Batson*, *supra* at 98 n 21. Accordingly, the "clear error" standard comports with the concept that assessment of credibility lies within the

trial court's province.[13]   In accordance with well-settled law, we thus conclude that the clear error standard governs appellate review of a trial court's resolution of *Batson*'s third step.

### 5. Summary of *Batson* Standard of Review

In sum, we conclude that the proper standard of review depends on which *Batson* step is before us.   If the first step is at issue (whether the opponent of the challenge has satisfied his burden of demonstrating a prima facie case of

---

[13] See, e.g., *Miller-El I*, *supra* at 339-340 (internal citations omitted):

> Credibility can be measured by, among other factors, . . . demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.

> \* \* \*

> "Deference to trial court findings on the issue of discriminatory intent makes particular sense in this context because, as we noted in *Batson*, the finding 'largely will turn on evaluation of credibility.'   In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed.   There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge.   As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies 'peculiarly within a trial judge's province.'"

discrimination), we review the trial court's underlying factual findings for clear error, and we review questions of law de novo. If *Batson*'s second step is implicated (whether the proponent of the peremptory challenge articulates a race-neutral explanation as a matter of law), we review the proffered explanation de novo. Finally, if the third step is at issue (the trial court's determinations whether the race-neutral explanation is a pretext and whether the opponent of the challenge has proved purposeful discrimination), we review the trial court's ruling for clear error.

## C. Remedies for *Batson* Violations

In the present case, defense counsel did not object to the dismissal of veniremembers Bonner and Johnson. Although he referred to Bonner and Johnson during his *Batson* objection, he only objected to the dismissal of veniremember Jones. Therefore, in this case, the *Batson* objection only pertains to the dismissal of veniremember Jones. In order to ensure that a trial court remedies all purposeful discrimination, however, courts should apply the *Batson* objection to all strikes in an alleged pattern.

In order for a pattern of strikes to develop, several jurors might be struck without objection until a pattern begins to emerge. If a trial court allowed earlier strikes

26

in a pattern to stand without taking remedial action, the court would potentially be allowing purposeful discrimination. Therefore, most jurisdictions do not consider a *Batson* objection waived if the prosecution fails to raise it immediately following the strike.

The case of *State v Ford*, 306 Mont 517, 523; 39 P3d 108 (2001), provided a thorough discussion of the rulings in different jurisdictions regarding *Batson* error preservation. Several jurisdictions held that a *Batson* challenge must be made before the jury is sworn, or else the issue is waived.[14] Additionally, numerous courts take the stance that a *Batson* challenge must also be raised before the court dismisses the venire.[15] One case held that *Batson* objections were waived once the stricken veniremembers left the courthouse, but the court

---

[14] *See State v Wilson*, 117 NM 11; 868 P2d 656 (NM App, 1993); *United States v Cashwell,* 950 F2d 699, 704 (CA 11, 1992); *United States v Dobynes,* 905 F2d 1192, 1196 (CA 8, 1990). *See also People v Hudson*, 157 Ill 2d 401; 626 NE2d 161 (1993).

[15] *See United States v Biaggi*, 909 F2d 662, 679 (CA 2, 1990); *Government of Virgin Islands v Forte*, 806 F2d 73, 76 (CA 3, 1986); *Morning v Zapata Protein (USA), Inc*, 128 F3d 213, 216 (CA 4, 1997); *United States v Abou-Kassem*, 78 F3d 161, 167 (CA 5, 1996); *United States v Rodriguez*, 917 F2d 1286, 1288 (CA 11, 1990); *State v Cummings*, 838 SW2d 4 (Mo App, 1992); *Sorensen v State*, 6 P3d 657, 662 (Wy, 2000); *State v Harris*, 157 Ariz 35, 36; 754 P2d 1139 (1988).

nonetheless underwent a *Batson* analysis for each of the discharged veniremembers in the pattern.[16]

There are several reasons why courts require a party to raise a *Batson* challenge before the venire is dismissed. First, the *Batson* objection warns the prosecutor, or the person peremptorily striking a juror, that he might be required to provide race-neutral explanations for the strike. *United States v Erwin*, 793 F2d 656 (CA 5, 1986). Furthermore, if a court finds a *Batson* violation after the venire is dismissed, then there must be a new jury-selection process and a new venire called. *State v Cummings,* 838 SW2d 4, 6 (Mo App, 1992). If a *Batson* challenge is made before the venire is discharged, however, the trial court can immediately correct the error and disallow the strike. See *State v Parker*, 836 SW2d 930 (Mo, 1992).

---

[16] In *State v Jacobs*, 803 So 2d 933 (La, 2001), the Louisiana Supreme Court held that the objections to the first three jurors were untimely, and thus waived, because "the jurors were no longer 'under any instructions' in the case." *Id.* at 939. The reason why *Jacobs* might not be easily applicable to other cases, however, is that the judge "effectively collapse[d] the first two stages of the Batson procedure . . . [and performed] the crucial third step of weighing the defendant's proof and the prosecutor's race-neutral reasons to determine discriminatory intent." *Id.* at 941. Therefore, although the judge claimed that the objection was untimely, he nonetheless undertook a *Batson* analysis and determined that there were race-neutral reasons for the jurors' dismissals.

Therefore, in order to preserve the option of reseating improperly stricken jurors, the court in *Parker* suggested that "[t]rial courts should refrain from releasing venirepersons who have been peremptorily struck until the venire is excused." *Id.* at 936 n 3.

Requiring courts to retain stricken jurors until the end of jury selection, however, could potentially burden trial courts and citizens called in for jury service if the selection process lasts several days.  Because of the difficulties in retaining stricken jurors, this Court concludes that a *Batson* challenge is timely if it is made before the jury is sworn. It must be noted, however, that if stricken veniremembers are dismissed and later found to be part of a pattern of discriminatory strikes, the only remaining remedy for the *Batson* violation would be to discharge the entire venire and start the process anew. A court may not ignore or fail to remedy the prior improper strikes simply because the court already dismissed the veniremembers.

In the present case, the prosecutor provided race-neutral explanations for her exclusion of veniremembers Bonner and Johnson, even though defense counsel did not specifically object to their dismissals.  The trial judge stated that she was not "satisfied with the prosecutor's

response as to potential juror Jones and Johnson," but because they already left, she did not rule on whether the prosecutor engaged in purposeful discrimination. Instead, she instructed the attorneys to be careful "from this point on" with their selections. If the judge had found a *Batson* error, however, her only remedial option would have been to dismiss the entire venire and select the jury from a new panel because she had already dismissed the stricken veniremembers.

## III. Analysis

The record reflects that the trial judge never explicitly found that the prosecutor violated *Batson*. Nor can we infer such a finding on this record. Instead, the record is susceptible to the fair inference that the trial judge acted to preserve the presence of minority jurors on the panel, knowing that the jury pool, as a matter of chance, was largely Caucasian. Protecting a defendant's right to a fair and impartial jury does not entail ensuring any particular racial composition of the jury.[17] The goal

---

[17] See, for example, a recent proposal to amend MCR 6.412. This proposed court rule would expressly prohibit the use of peremptory challenges to achieve a racially proportionate jury. It states:

(F) DISCRIMINATION IN THE SELECTION PROCESS.

(continued…)

of *Batson* and its progeny is to promote racial neutrality in the selection of a jury and to avoid the systematic and intentional exclusion of any racial group. *Taylor v Louisiana*, 419 US 522, 538; 95 S Ct 692; 42 L Ed 2d 690 (1975); *Holland v Illinois*, 493 US 474, 476-480; 110 S Ct 803; 107 L Ed 2d 905 (1990).

As a threshold matter, we must note that our task in resolving these cases is difficult, in large part, because of the trial judge's failure to rigorously follow the *Batson* procedures and, more importantly, to clearly articulate her findings and conclusions on the record. Therefore, under these circumstances, we must fairly read the record to determine exactly what the trial judge found and concluded in light of defendants' *Batson* objections.

On the basis of our reading of the voir dire transcripts, we conclude that the trial court did not, in

---

(…continued)

> (1) No person shall be subjected to discrimination during voir dire on the basis of race, color, religion, national origin, or sex.

> (2) Discrimination during voir dire on the basis of race, color, religion, national origin, or sex for the purpose of achieving what the court believes to be a balanced, proportionate, or representative jury in terms of these characteristics shall not constitute an excuse or justification for a violation of this subsection. [See *Michigan Bar Journal*, June 2005, p 64.]

fact, find a *Batson* violation and, thus, there is no error to complain of in these cases. The trial judge's initial expression of dissatisfaction with the prosecutor's race-neutral reasons, when considered in context with her subsequent remarks that "we are getting close to a sensitive issue," related to her concern about the number of minority veniremembers left on the panel. The judge further articulated her actual motivation in the following excerpt: "I think all of us are being, trying to be conscientious about the selection of these jurors *because of the racial makeup of the jury panels, which we don't have any control over.*" The trial judge's remarks do not reflect a finding that the prosecutor engaged in purposeful discrimination. Rather, the comments demonstrate that her true motivation was to ensure some modicum of racial balance in the jury panel. Use of peremptory challenges, however, to ensure racial proportionality in the jury is prohibited by *Batson* and will be prohibited by proposed MCR 6.412(F) if adopted.[18]

---

[18] Justice Cavanagh states that we rely on the above proposed court rule to support the proposition that the use of peremptory challenges to ensure racial proportionality in the jury is prohibited. We do not rely on the proposal to support this proposition. Rather, we cite to it to show that this *Court* is considering steps to prevent such problems from occurring in the future.

The trial judge never expressly found that the prosecutor exercised peremptory challenges for a racially discriminatory reason. In fact, her comments at the end of jury selection suggest a contrary conclusion. The trial judge was more concerned with achieving a proportionate racial composition on the jury than with the exclusion of veniremember Jones. She ultimately concluded that no *Batson* violation existed because a satisfactory number of African-American females were still present on the jury.

We reject Justice Cavanagh's conclusion that the trial judge ever found that defense counsel met his burden of proving purposeful discrimination. Rather, the trial judge's focus, as her comments reflect, was to ensure that the racial composition of the jury remained proportionate.

The purpose of *Batson* is to prevent discriminatory exclusions of veniremembers on the basis of race or gender. Here, the jury pool, by chance, contained a greater number of Caucasians than African-Americans. The trial judge was preoccupied with this fact. Her *Batson* analysis seemed to be infused with and confused by the erroneous belief that *Batson* is violated if the challenge resulted in too few minority jurors. The trial judge's statements did not imply that she would have kept Jones and Johnson on the jury because she thought they had been wrongfully excluded

on the basis of race.  Rather, her statements implied that she would have kept them on the jury to ensure that the number of African-American jurors remained proportionate to the number of Caucasian jurors.

The trial judge failed to recognize that a defendant is not entitled to a jury of a particular racial composition as long as no racial group is systematically and intentionally excluded.  *Taylor*, *supra* at 538; *Holland, supra* at 476-480.[19]  Defendants' jury was drawn from a fair cross section of the community.  Nor was any racial group systematically excluded.

## IV. Conclusion

On the basis of our reading of the voir dire transcripts, we hold no *Batson* violation occurred in this case and the trial judge neither explicitly nor implicitly found such a violation.  Giving the appropriate degree of deference to the trial judge's ultimate finding that the

---

[19] See also *United States v Ovalle*, 136 F3d 1092, 1107 (CA 6, 1998), in which the United States Court of Appeals for the Sixth Circuit struck down the Eastern District of Michigan's jury selection plan, which utilized the "subtraction" method of balancing the jury pool to ensure proportional representation of various racial groups within the community.  It held, "The selection of the grand and petit juries from a qualified jury wheel that was derived through racially discriminatory means, and the fact that the Jury Selection Plan was not narrowly tailored to meet any compelling governmental interest, constitute grounds for reversal of the defendants' convictions."

prosecutor did not engage in purposeful discrimination, we affirm defendants' convictions.

> Maura D. Corrigan
> Elizabeth A. Weaver
> Robert P. Young, Jr.
> Stephen J. Markman

S T A T E   O F   M I C H I G A N

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

    Plaintiff-Appellee,

v                                       No. 124996

JEROME L. KNIGHT,

    Defendant-Appellant.

_____

PEOPLE OF THE STATE OF MICHIGAN,

    Plaintiff-Appellee,

v                                       No. 125101

GREGORY M. RICE,

    Defendant-Appellant.

_____

WEAVER, J. *(concurring)*.

I concur in the majority's conclusion that, on a fair reading of the record, the trial court did not find that prospective jurors were excluded on the basis of race in violation of *Batson v Kentucky,* 476 US 79; 106 S Ct 1712; 90 L Ed 2d 69 (1986). During jury selection, the prosecutor exercised peremptory challenges to excuse prospective jurors Johnson and Bonner. Defense counsel did not object. A short time later, after the prosecution exercised a peremptory challenge to excuse prospective

juror Jones, defense counsel asked to approach the bench. Defense counsel objected to excusing Jones, asserting that she was being excused because she was black. In response to defense counsel's assertion, the prosecutor then explained her reasons for excusing Jones, as well as Johnson and Bonner. Throughout the discussion, the trial court stated that "we are getting close to a serious issue here." And after noting that the trial court has to accept or reject the prosecutor's reasons, determining whether they are race-neutral or not, the trial court stated: "And I'm not, I'm saying that I think we're getting close to a sensitive issue here on Jones and Johnson. That's all I'm saying. I'm making my record too." When this entire response is considered, it suggests that the trial court was not finding that a *Batson* violation had occurred, but was simply cautioning the parties that they may be getting "close" to a sensitive issue. Getting "close to a sensitive issue" is not the same thing as finding that a *Batson* violation has occurred and a prospective juror has been improperly excused on the basis of race.[1]

---

[1] Unlike the majority, I do not speculate with regard to the reasons for the trial court's statements. I simply conclude that after a fair reading of the record, the trial court did not find that a *Batson* violation had occurred.

Because I conclude that the trial court did not find that a *Batson* violation occurred, I express no opinion concerning the standard of review for *Batson* violations under steps two and three of the test or the appropriate remedies for *Batson* violations.

Elizabeth A. Weaver

# S T A T E   O F   M I C H I G A N

## SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

    Plaintiff-Appellee,

v                                      No. 124996

JEROME L. KNIGHT,

    Defendant-Appellant.

_____

PEOPLE OF THE STATE OF MICHIGAN,

    Plaintiff-Appellee,

v                                      No. 125101

GREGORY M. RICE,

    Defendant-Appellant.

_____

CAVANAGH, J. (*concurring in part and dissenting in part*).

I agree with the legal principles announced in parts II(A) and II(B) of the majority's opinion.[1]  I write

---

[1] I do not join part II(C) of the majority opinion because I do not believe that these cases are the proper vehicle to explore when a *Batson v Kentucky*, 476 US 79; 106 S Ct 1712; 90 L Ed 2d 69 (1986), objection must be raised. In these cases, the *Batson* objections were made in a relatively timely manner.  In this regard, these cases do not present a situation where a party is raising the *Batson* objection for the first time on appeal.  Further, these are not cases where a party waited until the end of trial to make a *Batson* objection.  While I applaud the majority's

                                  (continued…)

separately because I disagree with the majority's reading of the record. I believe that an evenhanded reading of the record demonstrates that the trial court found that prospective jurors were excluded on the basis of race in violation of *Batson v Kentucky,* 476 US 79; 106 S Ct 1712; 90 L Ed 2d 69 (1986), and its progeny. Further, I would hold that the trial court correctly made this determination under *Batson*'s three-step test.[2] Upon making this determination, however, the trial court reasoned that any *Batson* violation was cured by the eventual makeup of the jury because "the same number if not more" unchallenged African-American jurors remained on the panel that ultimately decided these cases. I would hold that the

---

(…continued)
efforts to clarify our *Batson* jurisprudence and provide our lower courts guidance, I must nonetheless refrain from joining part II(C) of the majority opinion. Because the timeliness of the *Batson* objections in these cases is not at issue, I would prefer to decide the larger issue of when a *Batson* objection must be lodged in a more suitable case.

[2] *Batson*'s three-step process is as follows: (1) the opponent of the peremptory challenge must make a prima facie showing of discrimination; (2) if the trial court determines that a prima facie showing has been made, the burden shifts to the proponent of the peremptory challenge to articulate a race-neutral explanation for the strike; and (3) if the proponent provides a race-neutral explanation, the trial court must then determine whether the race-neutral explanation is a pretext and whether the opponent of the challenge has proved purposeful discrimination. *Batson, supra* at 96-98.

initial *Batson* violation was not cured by the eventual makeup of the jury and, thus, the trial court erred by continuing the proceedings in this manner. Accordingly, I would reverse the judgments of the Court of Appeals and remand these cases for new trials.

## I. Factual Background

During jury selection, defendants raised objections to the prosecutor's use of her peremptory challenges. On the first and second days of jury selection, the prosecutor exercised a total of four peremptory challenges. On the third day, the prosecutor exercised three more peremptory challenges. Of the seven challenges the prosecutor had exercised at that point, three were against African-American veniremembers, one male and two females. After the prosecutor exercised her third challenge on day three, and after the court recessed for lunch, defense counsel raised a *Batson* objection.

Defense counsel argued that the prosecutor was excluding African-American veniremembers on the basis of race, specifically African-American males. The prosecutor responded by arguing that a pattern of discrimination was not present, noting that she struck four Caucasians and only three African-Americans. Moreover, the prosecutor argued, only one of the excluded African-Americans was

3

male.  While continuing to assert that the first step of *Batson* was not satisfied, the prosecutor also explained her reasons for excluding the African-Americans.  The trial court found that *Batson* had not been violated at that point, stating:

> But in this particular case and this particular matter, I do not see a pattern of the prosecution improperly excluding African American males, because they've only excluded one, or African American females where two have been excluded.
>
> I think the reasons are acceptable.  So I don't see a problem there.

The trial court then recessed for lunch, and the veniremembers returned to the courtroom after the break.

When jury selection resumed, the prosecutor exercised peremptory challenges to exclude veniremembers Johnson, Bonner, and Jones.  After the prosecutor sought to exclude veniremember Jones, defense counsel asked to approach the bench, and the trial court directed the veniremembers to leave the courtroom for a few minutes.  Defense counsel objected to the exclusion of these three African-American females on *Batson* grounds.  The trial court did not make any findings at this time; rather, the prosecutor argued that veniremember Bonner was excluded because she was closely related to two people who have been convicted of first-degree murder, not because she was African-American.

4

The prosecutor further asserted that veniremember Johnson was excluded because she had a close relative convicted of a drug charge and she was "hesitant in her demeanor." Finally, the prosecutor explained that she excluded veniremember Jones because Jones had a child close to the age of the victim and Jones was a professional working person. The trial court then noted that veniremember Berg, a Caucasian female who was also a professional working person, was not challenged and excluded from service. The following exchange then occurred:

> *The Court*: Just before we recessed for lunch, I thought that it was very clear that we didn't have a problem here. But now I think we are getting very close to a sensitive issue.
>
> I didn't see a problem with--
>
> [*Counsel for Defendant Knight*]: Miss Johnson, Your Honor.
>
> *The Court*: --Christine Johnson. She was, actually her demeanor was soft and she seemed very forthright and honest. And I understand with Miss Bonner, I didn't see any problems with that. But I was very surprised about Miss Johnson. I didn't say anything because the defense didn't object. So I didn't object.
>
> The same thing with Miss Jones. I do not see a reason other than--I mean, it seems to me for the prosecution to say, she has a daughter the same age as the victim, that would seem to work in the prosecution's favor, just in terms of thinking in the jury selection. *So I don't accept that.*
>
> [*The Prosecutor*]: Your Honor,--

5

*The Court*: I do see that we are getting close, and there are, I don't know two or three minority jurors left in this panel. So I think we are getting close to a serious issue here.

I wish that somebody had said something about keeping Miss Jones and Miss Johnson. And then we address this matter *because I probably would not have excused either one of them*.

* * *

*[The Prosecutor]*: Under *Batson . . .*, [a] prosecutor has to explain peremptory challenges with a neutral reason.

As long as I come up with a neutral reason for their dismissal, I believe that that's appropriate. And I given--

*The Court*: *But the Court has to accept or reject whether the reason is neutral or not.*

*[The Prosecutor]:* I understand.

*The Court*: *And I'm not*, I'm saying that I think we're getting close to a sensitive issue here on Jones and Johnson. That's all I'm saying. I'm making my record too.

* * *

*The Court*: We have to [be] realistic here. I really don't want any problems with this case, especially along these lines.

*I'm not satisfied with the prosecutor's response as to potential juror Jones and Johnson.* But I think they've already left.

* * *

I'm just saying, I let Jones and Johnson go without holding them, especially Jones. I guess I should have held her and I didn't do that. I'll take the fault for that. But from this point on let's try to be careful with this jury selection. We are close to getting this jury selected. [Emphasis added.]

6

Defense counsel inquired whether Johnson and Jones could be located; however, these veniremembers had already left the building. The panel was then called back into the courtroom, and jury selection was completed. At the end of selection, the trial court observed:

> With the panel that we ended up with, I think that any *Batson* problems that may have been there have been cured.
>
> We have the same number if not more jurors, African American female jurors on the panel as if we had kept Miss Christina Johnson and Miss Ruby Jones.
>
> I don't think either side ended up selecting this panel for any reason other than I think that these are the ones who will be the fair and impartial persons to hear and try this case.

In the end, the jury convicted defendant Knight of first-degree murder and codefendant Rice of first-degree murder and possession of a firearm during the commission of a felony.

## II. Analysis

I agree with the majority that this Court's "task in resolving these cases is difficult, in large part, because of the trial judge's failure to rigorously follow the *Batson* procedures and, more importantly, to clearly articulate her findings and conclusions on the record." *Ante* at 31. On the basis of its reading of the voir dire transcripts, the majority concludes that the trial court

7

did not, in fact, find a *Batson* violation and, thus, there is no error to complain of in these cases. With respect to veniremembers Johnson and Jones, I respectfully disagree and would conclude that the trial court believed that these veniremembers were excluded on the basis of race in violation of *Batson*. I am simply hard pressed to find anything in the record from which it can be fairly said that the trial court did not conclude that Johnson and Jones were excluded on the basis of race.

On the third day of jury selection, and after the lunch recess, defense counsel raised a *Batson* challenge to the exclusion of veniremembers Johnson, Bonner, and Jones.[3]

---

[3] This *Batson* challenge should not be confused with a similar objection defense counsel raised earlier that day. While the earlier objection provides some context for the later objection, I am concerned with the trial court's treatment of the later *Batson* objection—i.e., the objection to the exclusion of veniremembers Johnson and Jones.

Moreover, the majority posits that defense counsel's initial objection, as well as counsel's other objections, demonstrates counsel's misunderstanding of *Batson*. I disagree. Defense counsel initially asserted that the prosecutor had engaged in a pattern of systematically excluding African-American veniremembers. To establish a prima facie case of discrimination based on race under *Batson*'s first step, the opponent must show that (1) he or she is a member of a cognizable racial group; (2) the proponent has exercised a peremptory challenge to exclude a member of a certain racial group from the jury pool; and (3) all the relevant circumstances raise an inference that the proponent of the challenge excluded the prospective
(continued…)

The trial court did not decide whether defendants satisfied *Batson*'s first step by making a prima facie showing of racial discrimination. Instead, the prosecutor volunteered her reasons for the exclusions and attempted to proffer race-neutral explanations for the peremptory challenges. After considering the proffered explanations, the trial court rejected them, stating "I don't accept that," and "I'm not satisfied with the prosecutor's response as to potential juror Jones and Johnson." I find the following exchange particularly illustrative:

> *[The Prosecutor]*: Under *Batson* . . . , [a] prosecutor has to explain peremptory challenges with a neutral reason.
>
> As long as I come up with a neutral reason for their dismissal, I believe that that's appropriate. And I given--

---

(…continued)
juror on the basis of race. *Batson*, *supra* at 96. A pattern of strikes against members of a certain racial group certainly constitutes a relevant circumstance. Indeed, as the *Batson* Court itself noted, "a 'pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination." *Id*. at 97. *Batson* and its progeny do not *require* a pattern to be shown because the striking of even a single juror on the basis of race violates the Constitution. See, e.g., *J E B v Alabama ex rel TB,* 511 US 127, 142 n 13; 114 S Ct 1419; 128 L Ed 2d 89 (1994). However, a pattern of strikes against a particular racial group is still significant because it may give rise to an inference of discrimination. Thus, defense counsel's remarks do not demonstrate his misunderstanding of *Batson*.

> *The Court: But the Court has to accept or reject whether the reason is neutral or not.*
>
> *The Prosecutor: I understand.*
>
> *The Court: And I'm not . . . .*

On the basis of my review of the record, the only conclusion that can be fairly drawn is that the trial court believed that veniremembers Johnson and Jones were improperly excluded from the jury pool on the basis of race. In my view, the trial court effectively saw itself deciding *Batson*'s third prong, and concluded that the prosecutor's explanations were a pretext and, thus, purposeful discrimination had been demonstrated. This conclusion also finds record support where the trial court expressed regret for dismissing Johnson and Jones and not being able to reseat these prospective jurors.

Nor am I persuaded by the prosecutor's argument that the trial court *preliminarily* concluded that *Batson* may have been violated, but *ultimately* concluded that no violation occurred.[4] While this argument may be plausible

---

[4] The prosecutor directs this Court's attention to the following comments by the trial court:

> With the panel that we ended up with, I think that any Batson problems that may have been there have been cured.

(continued…)

10

in some instances, this is not one of them.  I believe that the trial court's comments noting that any *Batson* violation had been cured, and that "this panel" was not selected on racial grounds, did not alter the trial court's conclusion that veniremembers Johnson and Jones were excluded on the basis of race.  Stated differently, nothing in the record suggests that the trial court retracted its finding that Johnson and Jones were excluded in violation of *Batson*. While the record demonstrates that the trial court may have believed that "this panel" (the jury actually empaneled) was not subjected to discrimination and the trial court may have been concerned with the racial composition of the jury, the record clearly shows that the trial court also believed that excluded veniremembers Johnson and Jones were subjected to discrimination.

---

(…continued)
> We have the same number if not more jurors, African American female jurors on the panel as if we had kept Miss Christina Johnson and Miss Ruby Jones.
>
> I don't think either side ended up selecting this panel for any reason other than I think that these are the ones who will be the fair and impartial persons to hear and try this case.

Notably, the majority relies heavily on this same passage for the proposition that no *Batson* error occurred at all.

In sum, I would conclude that the record fairly reveals that the trial court found a *Batson* violation because it rejected the prosecutor's proffered explanations and would have recalled Johnson and Jones to sit on the jury if they could have been located. An evenhanded reading of the record shows that the trial court never retreated from its finding that these veniremembers were excluded on the basis of race. I tend to agree with the majority and suspect that some of the trial court's statements arguably stemmed from its desire to ensure a racially mixed jury and that such a desire is prohibited by *Batson* and its progeny.[5] Motivations aside, however, that does not change the fact that the trial court concluded that Johnson and Jones were excluded on the basis of race. In other words, regardless of the trial court's main goal, or the goal ascribed to it by the majority, the record clearly demonstrates that the trial court along the way also found that purposeful discrimination occurred in

---

[5] I disagree, however, with the majority's reliance on a proposed court rule that may be adopted sometime in the future. See *ante* at 31 n 17, 32. Instead, I prefer to simply examine this case under the constitutional concerns set forth in *Batson* and its progeny rather than rely on a *proposed* court rule that has not even taken effect.

violation of *Batson*.[6]  Because I conclude that the trial court found that *Batson* had been violated, the question becomes whether this determination was proper.

The prosecution argues that even if the trial court found a *Batson* violation, the proffered explanations were race-neutral and the trial court erred when it concluded that the reasons were a pretext.  Accordingly, the prosecution is questioning the trial court's resolution of *Batson*'s second and third steps.[7]  Thus, I would, consistent with this Court's stated approach, review de novo whether the prosecutor articulated a race-neutral explanation for the strike as a matter of law.  *United States v Uwaezhoke*,

---

[6] We should be mindful that our role is not to search for any plausible reason to avoid concluding that a trial court found that discrimination indeed occurred.  See, e.g., *Miller-El v Dretke*, __ US __; __ S Ct __; __ L Ed 2d __; 2005 US LEXIS 4658 *39 (2005) (*Miller-El II*) (If a prosecutor's proffered reason for a peremptory challenge "does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false.").  Like the majority, I could imagine many reasons to explain away the lower court proceedings.  But this would not change the fact that the trial court concluded that discrimination occurred in violation of *Batson*.  Again, while the record is not a model of clarity, I simply cannot ignore or explain away the trial court's conclusion.

[7] Appellate review of *Batson*'s first step is not implicated in these cases.  See *Hernandez v New York*, 500 US 352, 359; 111 S Ct 1859; 114 L Ed 2d 395 (1991) (plurality opinion).

13

995 F2d 388, 392 (CA 3, 1993). Further, I would review for clear error the trial court's determinations whether the race-neutral explanations were a pretext and whether defendants proved purposeful discrimination, according the trial court's findings high deference. *Miller-El v Cockrell*, 537 US 322, 340; 123 S Ct 1029; 154 L Ed 2d 931 (2003) (*Miller-El I*).

I agree with the prosecution that the proffered explanations for the peremptory challenges were facially valid under the Equal Protection Clause as a matter of law. The proponent of the peremptory challenge cannot satisfy his or her burden under *Batson*'s second step "by merely denying that he had a discriminatory motive or by merely affirming his good faith." *Purkett v Elem*, 514 US 765, 769; 115 S Ct 1769; 131 L Ed 2d 834 (1995). Rather, the proponent of a strike "must give a 'clear and reasonably specific' explanation of his 'legitimate reasons' for exercising the challenges," and the explanation must be "related to the particular case to be tried." *Batson*, *supra* at 98 & n 20, quoting *Texas Dep't of Community Affairs v Burdine*, 450 US 248, 258; 101 S Ct 1089; 67 L Ed 2d 207 (1981). "What it means by a 'legitimate reason' is not a reason that makes sense, but a reason that does not deny equal protection." *Purkett*, *supra* at 769. In other

14

words, the proffered reason does not always have to make perfect sense as long as the reason does not deny equal protection of the law. Here, the prosecutor's explanations for excluding veniremembers Johnson and Jones were based on something other than their race. See *Hernandez*, *supra* at 360. Further, discriminatory intent was not necessarily inherent in the prosecutor's explanations. *Id*. Thus, I believe that the prosecutor's explanations were race-neutral as a matter of law, and the trial court properly proceeded to the third step of the *Batson* inquiry.

According high deference to the trial court's findings, I cannot say under these circumstances that the trial court clearly erred under *Batson*'s third step when it concluded that veniremembers Johnson and Jones had been excluded on the basis of race. Resolution of *Batson*'s third step largely hinges on the evaluation of credibility, and "evaluation of the prosecutor's state of mind based on demeanor and credibility lies 'peculiarly within a trial judge's province.'" *Miller-El I*, *supra* at 339 (citation omitted). Here, the trial court rejected defendants' *Batson* challenge that was lodged earlier in the day. After the lunch recess, however, the record reveals that the trial court became suspicious of the prosecutor's method of exercising peremptory challenges. In light of defendants'

15

objection to the exclusion of veniremembers Johnson and Jones, and after observing the prosecutor's demeanor and listening to the proffered reasons for the peremptory challenges, the trial court concluded that these veniremembers were excluded on the basis of race.

The trial court noted that one of the proffered reasons for excluding Jones (that she was a professional working person) applied with equal force to a Caucasian woman who the prosecutor did not attempt to peremptorily challenge. The prosecutor explained that she excluded veniremember Jones because Jones had a child close to the age of the victim and Jones was a professional working person. The trial court then noted that veniremember Berg, a Caucasian female who was also a professional working person, was not challenged and excluded from service. See, e.g., *Miller-El II*, *supra* at *21 ("If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step."). Further, all three challenges exercised by the prosecutor after the recess were made against African-Americans. Thus, out of the ten peremptory challenges exercised by the prosecutor, six were against African-Americans. While

these facts alone certainly may not always justify a conclusion of purposeful discrimination in every case, the prosecutor's rationales, coupled with her demeanor, could have affected the trial court's credibility determination.[8] In light of the high degree of deference accorded to a trial court's credibility assessment in the *Batson* arena, I cannot say the trial court clearly erred when it found that the prosecutor's reasons for excluding veniremembers Johnson and Jones were a pretext. Thus, I would conclude that the trial court properly found that the prosecutor violated *Batson* when she excluded Johnson and Jones on the basis of their race.

In light of this conclusion, it must be determined whether, upon learning that Johnson and Jones could not be located, the trial court erred in proceeding in the manner that it did; namely, deciding that any *Batson* violation had

---

[8] For example, in *Miller-El I*, *supra* at 342-343, the United States Supreme Court noted that the prosecution's reasons for striking African-American members of the venire appeared race-neutral in that case. However, the fact that the prosecutor used ten of the fourteen challenges to exclude African-Americans, and three of the prosecution's race-neutral rationales for striking African-American veniremembers pertained just as well to some Caucasian veniremembers who were not challenged and who did serve on the jury, might suggest that the challenges were selective and based on racial considerations. See also *Miller-El II*, *supra* at *21.

been "cured" because the "same number if not more" of African-American jurors sat on defendants' jury. I conclude that the trial court erred in proceeding in this fashion. Such an approach not only ignores the structural nature of a *Batson* violation, but directly conflicts with the propositions on which *Batson* and its progeny are based.

"Jury service is an exercise of responsible citizenship by all members of the community, including those who otherwise might not have the opportunity to contribute to our civic life." *Powers v Ohio*, 499 US 400, 402; 111 S Ct 1364; 113 L Ed 2d 411 (1991). Allowing racial discrimination in the jury-selection process to go unremedied "offends the dignity of persons and the integrity of the courts." *Id*. Doing nothing is not an available remedy when a trial court is confronted with a recognizable *Batson* violation.[9]

---

[9] The *Batson* Court made it clear that state courts are to be accorded wide latitude in fashioning a remedy in light of a violation. *Batson*, *supra* at 99 n 24. There are two well-accepted remedies available to a trial court in the event a *Batson* violation occurs. I believe that these remedies are worth mentioning. First, if a trial court determines that a party exercised a peremptory challenge on the basis of race in violation of *Batson*, the trial court can disallow the challenge and seat the challenged veniremember. *Batson*, *supra* at 99 n 24 (concluding that a trial court should "disallow the discriminatory challenges and resume selection with the improperly challenged jurors reinstated on the venire"). See also *State v Grim*, 854

(continued…)

Here, the trial court's "same number if not more" or, stated differently, "no harm, no foul" approach does not comport with the principles of *Batson* and its progeny.  Not only does such an approach suggest that jurors are racially fungible, but it ignores the fact that veniremembers Johnson and Jones were excluded from the judicial process on the basis of race.  When faced with an argument similar to the one advanced by the trial court to support its approach, the Sixth Circuit Court of Appeals rejected this

--------

(…continued)
SW2d 403, 416 (Mo, 1993) ("[T]he proper remedy for discriminatory use of peremptory strikes is to quash the strikes and permit those members of the venire stricken for discriminatory reasons to sit on the jury if they otherwise would.").

Second, if a trial court determines that the discrimination in the selection process is more pervasive, the court may discharge the entire venire and start the process anew.  *Batson, supra* at 99 n 24 (concluding that the trial court may "discharge the venire and select a new jury from a panel not previously associated with the case").  See also *State v McCollum*, 334 NC 208, 236; 433 SE2d 144 (1993) ("As *Batson* violations will always occur at an early stage in the trial before any evidence has been introduced, the simpler, and we think clearly fairer, approach is to begin the jury selection anew with a new panel of prospective jurors who cannot have been affected by any prior *Batson* violation.")

In sum, a trial court is under an affirmative duty to ensure that the constitutional mandates of *Batson* are respected.  While there may be other options available to a trial court to remedy a *Batson* violation, permitting purposeful discrimination to stand without crafting a remedy is *not* an acceptable option.

19

argument and reasoned that "[w]here purposeful discrimination has occurred, to conclude that the subsequent selection of an African-American juror can somehow purge the taint of a prosecutor's impermissible use of a peremptory strike to exclude a veniremember on the basis of race confounds the central teachings of *Batson*." *Lancaster v Adams*, 324 F3d 423, 434 (CA 6, 2003). See also *United States v Harris*, 192 F3d 580, 587 (CA 6, 1999) (rejecting the proposition that the failure to exclude one member of a protected class is sufficient to insulate the unlawful exclusion of others.); *United States v Battle*, 836 F2d 1084, 1086 (CA 8, 1987) ("We emphasize that under *Batson*, the striking of a single black juror for racial reasons violates the equal protection clause, even though other black jurors are seated, and even when there are valid reasons for the striking of some black jurors."); *United States v David*, 803 F2d 1567, 1571 (CA 11, 1986). While a defendant does not have a right to a jury composed in whole or in part of persons of the defendant's own race, the defendant "does have the right to be tried by a jury whose members are selected pursuant to non-discriminatory criteria." *Batson*, *supra* at 85-86. In light of these principles, as well as more recent United States Supreme Court precedent, I believe that the trial court's rationale

was fundamentally defective.  See, e.g., *Powers*, *supra* at 410-414.

Granted, the trial court was placed in a precarious situation because Johnson and Jones could not be located. Accordingly, the trial court could not have disallowed the prosecutor's challenges and resumed selection with Johnson and Jones reinstated on the venire.[10]  *Batson*, *supra* at 99 n 24.  However, the trial court could have discharged the venire and selected a new jury from a panel not associated with the case.  *Id.*; see also *ante* at 30.  Although inaction is not an option, the trial court failed to take any remedial action after finding a *Batson* violation.  It was only by chance that the "same number if not more" of African-Americans ultimately served on defendants' jury. But *Batson* is principally concerned with why certain veniremembers are excluded and requires remedial action if those veniremembers are excused on the basis of race.  I reject the trial court's rationale that the discrimination

---

[10] In this regard, the trial court observed that the veniremembers could not be located because they left the building.  The record is unclear exactly what steps the trial court took to find Johnson and Jones.  The trial court possibly could have done more to locate these veniremembers.  And if these veniremembers were located, the trial court would have then had the option to reinstate Johnson and Jones on the venire.

against veniremembers Johnson and Jones was somehow "cured" by the eventual makeup of the jury. Therefore, I would hold that the trial court erred when it did not take any action to remedy the *Batson* violation.

Because the trial court concluded that Johnson and Jones were purposefully excluded from the jury pool on the basis of race and the trial court erred by failing to remedy these *Batson* violations, I would conclude that this error is subject to automatic reversal. This Court has yet to formally decide the issue whether a *Batson* violation is structural error that defies harmless error analysis. Structural errors "are intrinsically harmful, without regard to their effect on the outcome, so as to require automatic reversal." *People v Duncan*, 462 Mich 47, 51; 610 NW2d 551 (2000). In other words, structural errors affect the entire conduct of the trial from beginning to end, and these errors alter the framework within which the trial proceeds. *Arizona v Fulminante*, 499 US 279, 309-310; 111 S Ct 1246; 113 L Ed 2d 302 (1991).[11] In this regard, it must

---

[11] In *Fulminante*, *supra* at 310, the Court noted that some examples of structural defects involve the right to self-representation at trial, *McKaskle v Wiggins*, 465 US 168, 177 n 8; 104 S Ct 944; 79 L Ed 2d 122 (1984), and the right to a public trial, *Waller v Georgia*, 467 US 39, 49 n 9; 104 S Ct 2210; 81 L Ed 2d 31 (1984). Notably, the
(continued…)

22

be observed that the United States Supreme Court has never suggested that the discriminatory exclusion of prospective jurors is subject to harmless error review. Indeed, my review of the Court's precedent, as well as the decisions from the federal Courts of Appeals, compels the conclusion that the purposeful exclusion of a prospective juror on the basis of race is considered structural error and, thus, it defies harmless error analysis.

The United States Supreme Court has stressed that unlawful exclusions in violation of *Batson* taint the entire conduct of the trial. Indeed, "the effects of racial discrimination during voir dire 'may persist through the whole course of the trial proceedings.'" *Tankleff v Senkowski*, 135 F3d 235, 248 (CA 2, 1998), quoting *Powers*,

---

(…continued)

United States Supreme Court also observed that the unlawful exclusion of members of the defendant's race from a grand jury was a structural defect not subject to harmless error analysis. *Fulminante*, *supra* at 310, citing *Vasquez v Hillery*, 474 US 254; 106 S Ct 617; 88 L Ed 2d 598 (1986). More recently, in *Neder v United States*, 527 US 1, 8; 119 S Ct 1827; 144 L Ed 2d 35 (1999), the Court again cited *Vasquez* for the proposition that racial discrimination in the selection of grand jurors is structural error subject to automatic reversal. While the precedential value of this proposition has been questioned because Justice White did not join this portion of the *Vasquez* opinion, the United States Supreme Court itself has cited *Vasquez* with approval on this proposition.

*supra* at 412.  To this end, the United States Supreme Court has stated:

> A prosecutor's wrongful exclusion of a juror by a race-based peremptory challenge is a constitutional violation committed in open court at the outset of the proceedings.  The overt wrong, often apparent to the entire jury panel, casts doubt over the obligation of the parties, the jury, and indeed the court to adhere to the law throughout the trial of the cause.  [*Powers*, *supra* at 412.]

On the basis of this language, the Eight Circuit Court of Appeals has concluded that *Powers* "is a strong indication that the Supreme Court would hold that a constitutional error involving race-based exclusion of jurors infects the entire trial process itself and is hence a structural error."  *Ford v Norris*, 67 F3d 162, 171 (CA 8, 1995).  Stated differently, unlawful exclusions on the basis of race are intrinsically harmful.

Further, the United States Supreme Court has also stressed the impact these exclusions have on the whole system.  For example, the Court has observed that "[t]he exclusion of even one juror for impermissible reasons harms that juror and undermines public confidence in the fairness of the system."  *J E B v Alabama*, 511 US 127, 142 n 13; 114 S Ct 1419; 128 L Ed 2d 89 (1994).  Accordingly, the United States Supreme Court has consistently reversed convictions without first determining whether the unlawful exclusion of

24

potential jurors affected the trial's outcome. See, e.g., *Powers*, *supra* at 416. The Court has also required automatic reversal where unlawful discrimination was shown in the selection of grand jurors. *Vasquez*, *supra* at 263-264; *Rose v Mitchell*, 443 US 545, 556; 99 S Ct 2993; 61 L Ed 2d 739 (1979). Because the Court emphasizes the impact these exclusions have on the judicial system and regularly subjects such error to automatic reversal, I believe that the Court would hold that a race-based exclusion of a prospective juror is structural error.

The majority of federal Courts of Appeals that have examined this issue generally have reached the same result and have concluded that race-based exclusions are structural error not subject to harmless error analysis. See, e.g., *Tankleff*, *supra* at 248; *Rosa v Peters*, 36 F3d 625, 635 n 17 (CA 7, 1994); *Davis v Secretary for Dep't of Corrections*, 341 F3d 1310, 1316-1317 (CA 11, 2003); *United States v Angel*, 355 F3d 462, 470-471 (CA 6, 2004); *Williams v Woodford*, 396 F3d 1059, 1069 (CA 9, 2005). I would join those jurisdictions and likewise conclude that the purposeful exclusion of a prospective juror on the basis of race is structural error. The United States Supreme Court has made it clear that the purposeful exclusion of a veniremember on the basis of race defies "harmless error"

25

analysis and merits automatic reversal. *Johnson v United States*, 520 US 461, 468-469; 117 S Ct 1544; 137 L Ed 2d 718 (1997); *J E B*, *supra* at 142 n 13. Therefore, until the United States Supreme Court holds otherwise, if a reviewing court determines that a prospective juror was excluded from the jury pool on the basis of race, this is structural error subject to automatic reversal. Accordingly, because the trial court found that *Batson* had been violated but erred in not remedying the discrimination, defendant Knight and codefendant Rice are entitled to new trials.

## III. Conclusion

A fair reading of the voir dire transcripts indicates the trial court found that veniremembers Johnson and Jones were excluded on the basis of race in violation of *Batson* and its progeny. I would hold that the trial court correctly determined that the principles of *Batson* had been violated. The prosecutor's proffered explanations for the exclusions were race-neutral as a matter of law, and the trial court did not clearly err when it rejected these explanations and determined that defendants had proved purposeful discrimination. However, I would hold that the purposeful exclusion of veniremembers Johnson and Jones on the basis of race was not cured by the eventual makeup of the jury and, thus, the trial court erred by continuing the

proceedings without remedying the *Batson* violations.  Thus, I would reverse the judgments of the Court of Appeals and remand these cases for new trials.

Michael F. Cavanagh
Clifford W. Taylor
Marilyn Kelly